Robert L. Levy (RL-1633)
BANTLE & LEVY LLP
817 Broadway
New York, New York 10003
(212) 228-9666
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                                :
EVELYN BETTENCOURT,                                             :        06 CV 13264 (WHP) (HP)
                                                                :        ECF CASE
                                    Plaintiff,                   :
                                                                :        **COMPLAINT**
            -against-                                            :
                                                                :        PLAINTIFF DEMANDS
BRONX-LEBANON HOSPITAL CENTER                                   :        TRIAL BY JURY
and SRIDHAR CHILIMURI,                                          :
                                                                :
                                    Defendants.                 :
                                                                :
----------------------------------------------------------------x

Plaintiff Evelyn Bettencourt, by her attorneys, Bantle & Levy LLP, alleges for her

complaint against defendants Bronx-Lebanon Hospital Center and Sridhar Chilimuri as follows:

## NATURE OF THE ACTION

1.      This is an action for employment discrimination based on gender and

retaliation for opposing discrimination in the workplace, in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII"), the New York State

Human Rights Law, New York Executive Law §290 et seq., (the "Executive Law"), and the New

York City Administrative Code §8-101 et seq., (the "Administrative Code").  Plaintiff seeks

declaratory and injunctive relief and damages.

## JURISDICTION AND VENUE

2.      The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e et

seq., as amended, 29 U.S.C. § 621 et seq., and 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

3.      Venue is properly laid in this district pursuant to 28 U.S.C. §1391(b)(2)

because the unlawful acts and omissions giving rise to claims alleged herein were committed

within the district of the United States District Court, Southern District of New York.

4.      All conditions precedent to jurisdiction under §706 of Title 7, 42 U.S.C.

§2000e-5(f)(3) and §7(d), 29 U.S.C. 626(d), have occurred or been complied with:

a.      A charge of employment discrimination on the basis of gender and

retaliation was filed with the Equal Employment Opportunity Commission ("EEOC") within 300

days of the adverse actions of which plaintiff complains in this action.

b.      A notification of right to sue was issued by the EEOC on or about

August 30, 2006.

c.      This complaint has been filed within 90 days of plaintiff's receipt

of the EEOC's notification of right to sue and less than three years after defendant wilfully

engaged in the unlawful action set forth herein.

## PARTIES

5.      Plaintiff Evelyn Bettencourt, is a citizen of the United States and the State

of New York who currently resides at 570 Isham Street, New York, New York 10034.  At all

times relevant herein, Bettencourt resided in and was a citizen of the State of New York.

6.      Bettencourt has been employed at the Bronx-Lebanon Hospital Center

("BLHC" or the "Hospital") since November 1991.

7.      Upon information and belief, at all times relevant herein, defendant

BLHC is a New York corporation with its principal place of business at 1276 Fulton Avenue,

Bronx, New York.

8.      Upon information and belief, at all times relevant herein, BLHC operates a

health care hospital system serving, inter alia, the South and Central Bronx, New York.

9.      Upon information and belief, defendant Sridhar Chilimuri, M.D. ("Dr.

Chilimuri") is and was at all times relevant herein Chairman of the Hospital's Department of

Medicine.

10.     Upon information and belief, Dr. Chilimuri was and is a citizen of the

United States and a resident of the State of New York.

11.     At all times relevant herein, BLHC is and was an employer engaged in

industry affecting commerce and has employed more than 100 employees within the meaning of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-(b), (g) and (h).

12.     All defendants are persons within the meaning of New York Executive

Law §292(1), and New York City Administrative Code §8-102(1), and BLHC is an employer

within the meaning of New York City Administrative Code §§8-102(5) and 8-107.

## STATEMENT OF FACTS

**Bettencourt's Exemplary Employment**
**Within BLHC's Department of Medicine**

13.     Bettencourt commenced employment at BLHC in or about November

1991.

14.     For approximately fourteen (14) years, from the commencement of her

employment at BLHC until her abrupt and unlawful transfer, Bettencourt worked in BLHC's

Department of Medicine.

15.     Bettencourt has a well-documented record of extraordinary service to the Hospital during her approximately fourteen years working within BLHC's Department of Medicine.

16.     Bettencourt consistently received outstanding written and oral performance evaluations throughout her tenure within the Department of Medicine.

17.      As a result of her consistently outstanding performance, Bettencourt received several promotions during her tenure within the Department of Medicine.

18.     After approximately three years as an Administrative Secretary, in or about January 1995 Bettencourt was promoted to the position of Residency Program Coordinator.

19.     In or about January 2002, Bettencourt was made Residency Program Administrator for the Internal Medicine Residency Program in the Department of  Medicine and Administrator of the Hospital's Institutional Review Board ("IRB").

20.     As Residency Program Administrator, Bettencourt had daily responsibility for overseeing the administration of a residency program accredited by the Accreditation Council for Graduate Medical Education ("ACGME").

21.     In or about Spring 2004, Bettencourt's job responsibilities were expanded to include primary responsibility for managing the daily administrative operations of the Department of Medicine, including without limitation, the functioning of the Residency Program and the Institutional Review Board.

22.     Bettencourt also was given supervisory authority over several

administrative staff members and the office manager for the Department of Medicine.

23.     In a performance evaluation in January 2005, Bettencourt was rated "exceptional" in the performance of the vast majority of her duties and was described as having performed "outstandingly well in all aspects" and to have "consistently exceed[ed] expectations in all aspects."

24.     Based on her outstanding performance during the prior year and in recognition for the increased responsibilities she assumed in 2004, in February 2005 Bettencourt received a substantial salary increase and was told that she would be formally promoted to the position of Assistant Administrative Director, Department of Medicine.

25.     Bettencourt never received the formal promotion to the position of Assistant Administrative Director, Department of Medicine.

26.     Rather, Bettencourt was unlawfully transferred out of the Department of Medicine to a less prestigious and less desirable position in the Department of Dentistry.

**Bettencourt's Professional and
Personal Relationship with Dr. Chilimuri**

27.     Throughout the majority of her employment within BLHC's Department of Medicine, Bettencourt was directly supervised by Dr. Chilimuri.

28.     In or about February 2000, after months of being pursued by him, Bettencourt entered into a romantic relationship with Dr. Chilimuri which lasted approximately 41/2 years.

29.     During the entirety of this romantic relationship, Dr. Chilimuri was married to a former resident in the Department of Medicine's Residency Program who Dr. Chilimuri had supervised and married while she served as Chief Resident of the Residency

Program.

30.     During the entirety of the romantic relationship, Dr. Chilimuri insisted that

Bettencourt keep the existence of the relationship confidential and threatened Bettencourt with

reprisals if the relationship became known within the Hospital.

31.     Bettencourt terminated the romantic relationship with Dr. Chilimuri in

Fall 2004 after Dr. Chilimuri confessed to her that he was having an affair with Dr. Dimple

Patel, a then-attending physician within the Department of Medicine.

32.     On information and belief, as of the time Bettencourt terminated the

romantic relationship with Dr. Chilimuri there were no complaints about the relationship within

the Hospital or charges of preferential treatment in favor of Bettencourt leveled against Dr.

Chilimuri.

33.     Commencing shortly after Bettencourt terminated her romantic

relationship with Dr. Chilimuri, Dr. Chilimuri became verbally abusive to Bettencourt in the

workplace.

34.     Commencing shortly after Bettencourt terminated her romantic

relationship with Dr. Chilimuri, Dr. Chilimuri began to systematically reduce Bettencourt's

responsibilities within the Department of Medicine and to encourage her colleagues within the

Department of Medicine to distance themselves from her.

**Dr. Chilimuri's Preferential
Treatment of Dr. Patel**

35.     Throughout his relationship with Dr. Patel, Dr. Chilimuri has engaged in

overt acts of favoritism towards Dr. Patel, including without limitation, shifting a portion of her

workload to another doctor, giving her preference in scheduling of hours and openly interceding

on her behalf in certain disputes she had with other personnel within the Department of

Medicine.

36.     In or about mid-2004, Dr. Chilimuri promoted Dr. Patel to the position of

Clinic Director of the Third Avenue Clinic.

37.     On information and belief, in promoting Dr. Patel to Clinic Director of the

Third Avenue Clinic, Dr. Chilimuri passed over several physicians at the Hospital with more

professional experience than Dr. Patel.

38.     In or about April 2005, Dr. Chilimuri promoted Dr. Patel to the position of

Chief of General Medicine within BLHC's Department of Medicine.

39.     On information and belief, in promoting Dr. Patel to Chief of General

Medicine, Dr. Chilimuri passed over several physicians at the Hospital with more professional

experience than Dr. Patel.

40.     On information and belief, in championing Dr. Patel's meteoric rise within

the Department of Medicine, Dr. Chilimuri alienated many physicians within the Department of

Medicine.

41.     On information and belief, as result of Dr. Chilimuri's unabashed

preferential treatment of Dr. Patel, approximately seven members of the Department of Medicine

have been transferred out of the Department or terminated.

42.     On information and belief, Dr. Chilimuri's unabashed preferential

treatment of Dr. Patel prompted the circulation of at least two letters of complaint concerning

Dr. Chilimuri's conduct within the Hospital.

**Bettencourt Opposes Dr. Chilimuri's**
**Preferential Treatment of Dr. Patel**

7

43.     On or about April 7, 2005, Bettencourt met with Dr. Milton Gumbs,

BLHC's Vice-President of Medical Education regarding allegations that Dr. Chilimuri was

engaged in an improper relationship with Dr. Patel and was providing her preferential treatment.[1]

44.     In her meeting with Dr. Gumbs, Bettencourt expressed concern that

Dr. Patel was being afforded preferential treatment by Dr. Chilimuri, including being promoted

over more qualified candidates, as a result of maintaining a romantic relationship with him.

45.     In her meeting with Dr. Gumbs, Bettencourt also expressed concern that

she was being treated less favorably in the workplace by Dr. Chilimuri since she had terminated

their romantic relationship.

46.     On April 15, 2005, Bettencourt met with Ms. Selena Griffin-Mahon of the

Hospital's Human Resources Department regarding Dr. Chilimuri's apparent breaches of the

Supervisor Non-Fraternization Policy.

47.     At that meeting, Bettencourt confirmed that she had a past relationship

with Dr. Chilimuri and that she was aware of Dr. Chilimuri's ongoing relationship with

Dr. Patel.

48.     At that meeting, Bettencourt again expressed her concern that Dr. Patel

was receiving preferential treatment from Dr. Chilimuri as a consequence of their romantic

relationship, and that she was now being subjected to negative treatment by Dr. Chilimuri

subsequent to having terminated his relationship with her.

49.     Subsequent to the April 15, 2005 meeting, Bettencourt submitted a written

---

[1]     At all times relevant herein, BLHC had a Human Resources's regulation that expressly "prohibit[ed] managers and supervisors from dating any individual in a subordinate relationship to the respective manager or supervisor."  (The "Supervisor Non-Fraternization Policy".)

statement to Ms. Griffin-Mahon summarizing the issues they had discussed, including without

limitation, acknowledging her past relationship with Dr. Chilimuri, confirming her knowledge of

his ongoing relationship with Dr. Patel, reiterating her concern that Dr. Patel was being afforded

favorable treatment by Dr. Chilimuri and reiterating her concern that Dr. Chilimuri was now

harassing her in the workplace.

50.     In her written statement to Ms. Griffin-Mahon, Bettencourt also stated that

she believed that Dr. Chilimuri was attempting to influence her communications with Human

Resources regarding his conduct.

51.     Bettencourt hand delivered this letter to Human Resources on April 19,

2005.

52.     On April 20, 2005, Bettencourt delivered an addendum to her prior written

statement to Ms. Griffin-Mahon.

53.     In the addendum, Bettencourt briefly described an incident that had

occurred earlier that day in which Dr. Chilimuri began to physically threaten Bettencourt

because Bettencourt refused to allow him to dictate when and what Bettencourt said to Human

Resources in connection with its investigation into his conduct.

**Bettencourt Is Subjected to Discriminatory and
Retaliatory Treatment, Including Being Transferred
To a Less Prestigious and Less Desirable Position**

54.     In the weeks following Bettencourt's meetings with Human Resources and

her written submissions, Bettencourt was subjected to intensified bullying and harassing conduct

by Dr. Chilimuri.

55.     For example, during a meeting with Dr. Chilimuri and Ms. Griffon-Mahon

on May 11, 2005, Dr. Chilimuri stripped Bettencourt of her supervisory responsibilities.

56.	Similarly, Dr. Chilimuri limited Bettencourt's access to computerized Residency Program records which she regularly had utilized in her capacity as Residency Program Administrator.

57.	Dr. Chilimuri and Ms. Griffin-Mahon offered Bettencourt no explanation for these employment actions.

58.	Later that day, Bettencourt met with Ms. Griffin-Mahon and complained that the changes to her responsibilities were retaliatory.

59.	Ms. Griffin-Mahon summarily dismissed Bettencourt's complaint, advising Bettencourt that the President was prepared to fully support Dr. Chilimuri in all matters related to the investigation of his conduct.

60.	At or about this time, Bettencourt was advised by a physician within the Department of Medicine, Dr. Raghunandun Loganathan, that Dr. Chilimuri had (1) threatened him in an attempt to dictate what Dr. Loganathan told Human Resources regarding Dr. Chilimuri's conduct; and (2) told him that Bettencourt was planning to report him to the INS.

61.	Dr. Loganathan also told Bettencourt a senior member of BLHC's administration had told him that Bettencourt was an "evil woman".

62.	On information and belief,  Dr. Loganathan was terminated by Dr. Chilimuri after he refused to permit Dr. Chilimuri to force him into misstating facts to Human Resources.

63.	On May 18, 2005, Bettencourt was advised in writing by Ms. Griffin-Mahon that her discrimination and retaliation complaint had been dismissed by

BLHC.

64.     In that writing, BLHC indicated, <u>inter alia</u>, that its investigation had not

established that Dr. Chilimuri and Dr. Patel "had entered into an improper relationship."

65.     Bettencourt found this conclusion particularly astounding given that

months before the investigation commenced Dr. Chilimuri had admitted the relationship to her

and told her that he had disclosed his relationship with Dr. Patel to Dr. Gumbs.

66.     On June 1, 2005, approximately two weeks after the dismissal of her

complaint of discrimination and retaliation, Bettencourt was advised in writing by BLHC that

she was being transferred to the Department of Dentistry where she was to assume the position

of Program Administrator/IRB, Department of Dentistry.

67.     The memorandum advising her of this transfer provided no explanation

for the Hospital's action.

68.     Bettencourt objected to this transfer for several reasons, including without

limitation, that the position in the Department of Dentistry: (1) is less prestigious than the

comparable position in the Department of Medicine; (2) does not include supervisory

responsibilities and/or responsibility for departmental budgetary, administrative or payroll

issues;  (3) provides less opportunity for professional growth; (4) provides more limited

opportunity for increased compensation over time, including without limitation, smaller annual

bonus opportunities; and (5) was located in the basement of a building several blocks from the

main hospital building, thereby separating her from her colleagues and from the files she needed

to perform her functions on behalf of the IRB.

69.     Bettencourt further objected to the transfer insofar as pushing her out of

the Department of Medicine stigmatized her as a "wrongdoer" in the wake of the Hospital's

investigation into complaints against Dr. Chilimuri.

71.    Conversely, Dr. Chilimuri received no sanction from the Hospital despite

his clear violations of the Hospital's Supervisor Non-Fraternization Policy and applicable

anti-discrimination laws and his unabashed attempts to influence the Hospital's investigation

into allegations of his misconduct.

71.    By permitting Dr. Chilimuri to twice promote Dr. Patel while banishing

Bettencourt from his professional orbit and into a less prestigious position, BLHC sent a clear

message that, inter alia, women will be professionally  rewarded for their romantic involvement

with Dr. Chilimuri and will be subjected to adverse employment actions when they terminate

such relationships.

72.    Despite Bettencourt's objections, her transfer to the Department of

Dentistry took effect on June 6, 2005.

73.    Effective June 6, 2005, Bettencourt was assigned to share a basement

office within the Department of Dentistry.

74.    The Hospital's transfer of Bettencourt from the Department of Medicine

to the Department of Dentistry materially altered the terms and conditions of her employment,

including without limitation, denying her the prestige, opportunity for advancement and

opportunity for increased compensation associated with her position administering an

ACGME-accredited medical residency program, and relegating her to a less prestigious

department with little opportunity for professional growth.

75.    Bettencourt's transfer to the Department of Dentistry also prevented her

from being eligible to attend conferences for Internal Medicine Coordinators and from being

eligible to obtain a Program Coordinator's certification relating to the administration of an

ACGME-accredited medical program.

76.     Bettencourt had been pursuing the Program Coordinator's certification for

several months and was expecting to satisfy all of the certification requirements in or about the

Spring of 2006.

77.     Given Bettencourt's outstanding performance record while employed in

the Department of Medicine, there is no legitimate, non-discriminatory and/or non-retaliatory

justification for her abrupt transfer.

78.     Bettencourt's abrupt transfer to the Department of Dentistry, which

occurred approximately one month after she had submitted written and oral complaints of

discrimination and retaliation to BLHC's Human Resources Department, constitutes an adverse

employment action in violation of Bettencourt's rights under federal, state and city

anti-discrimination laws.

79.     As a consequence of the foregoing, Defendants have discriminated against

and retaliated against Bettencourt in the terms and conditions of her employment and, thereby,

have substantially interfered with Bettencourt's continuing opportunities for professional

advancement, career development, recognition, increased compensation and other benefits and

perquisites of employment at BLHC.

80.     As a result of Defendants' discriminatory and retaliatory transfer of

Bettencourt to a less prestigious and desirable position within BLHC, Bettencourt has suffered a

loss of income, professional stature and benefits.

81.    As a result of Defendants' discriminatory and retaliatory transfer of

Bettencourt to a less prestigious and desirable position within BLHC, Bettencourt has sustained

serious pain and suffering, and severe mental and emotional harm and distress.

82.    The aforesaid acts and conduct by Defendants were performed willfully,

intentionally, maliciously and with reckless indifference to Bettencourt's protected rights.

## COUNT I

83.    Plaintiff repeats and realleges each and every allegation made in

paragraphs numbered 1 through 82 as if fully set forth herein.

84.    As a result of defendant BLHC's aforesaid acts, defendant BLHC has

discriminated against plaintiff on account of her gender in violation of Title VII of the Civil

Rights Act as amended, 42 U.S.C. § 2000e-2(a).

85.    As a result of defendant BLHC's discriminatory and adverse acts, plaintiff

has suffered damage, including, without limitation, deprivation of income and benefits, loss of

opportunity for advancement and promotion, emotional pain, suffering, inconvenience, mental

anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## COUNT II

86.    Plaintiff repeats and realleges each and every allegation made in

paragraphs numbered 1 through 85 as if fully set forth herein.

87.    As a result of defendant BLHC's aforesaid acts, defendant BLHC has

retaliated against plaintiff for opposing discrimination in the workplace in violation of Title VII

of the Civil Rights Act as amended, 42 U.S.C. § 2000e-2(a).

88.    As a result of defendant BLHC's discrimination against her, plaintiff has

suffered damages, including without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, compensatory damages, emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to her reputation and career.

### COUNT III

89.      Plaintiff repeats and realleges each and every allegation made in paragraphs numbered 1 through 88 as if fully set forth herein.

90.      By their actions and omissions, defendants have discriminated against plaintiff on account of her gender in violation of the New York Executive Law, §290 et seq., commonly known as the New York Human Rights Law.

91.      Defendant Chilimuri has violated New York Executive Law §296(6) by aiding, abetting, inciting and coercing the unlawful discrimination outlined above.

92.      As a result of defendants' discrimination against her, plaintiff has suffered damages, including without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, compensatory damages, emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to her reputation and career.

### COUNT IV

93.      Plaintiff repeats and realleges each and every allegation made in paragraphs numbered 1 through 92 as if fully set forth herein.

94.      By their actions and omissions, defendants have retaliated against plaintiff for opposing discrimination in the workplace in violation of the New York Executive Law, §290 et seq.

95.      Defendant Chilimuri has violated New York Executive Law §296(6) by

15

aiding, abetting, inciting and coercing the unlawful retaliation outlined above.

96.     As a result of defendants' retaliation against her, plaintiff has suffered

damages, including without limitation, deprivation of income and benefits, loss of opportunity

for advancement and promotion, compensatory damages, emotional pain, suffering,

inconvenience, mental anguish, humiliation and damage to her reputation and career.

## COUNT V

97.     Plaintiff repeats and realleges each and every allegation made in

paragraphs numbered 1 through 96 as if fully set forth herein.

98.     By their actions and omissions, defendants have discriminated against

plaintiff on account of her gender with respect to compensation, benefits and terms, conditions

and privileges of employment, in violation of New York City Administrative Code §8-107(1)(a).

99.     Defendant Chilimuri has violated New York City Administrative Law

§296(6) by aiding, abetting, inciting and coercing the unlawful discrimination outlined above.

100.    As a result of defendants' discrimination against her, plaintiff has suffered

damages, including without limitation, deprivation of income and benefits, loss of opportunity

for advancement and promotion, compensatory damages, emotional pain, suffering,

inconvenience, mental anguish, humiliation and damage to her reputation and career.

## COUNT VI

101.    Plaintiff repeats and realleges each and every allegation made in

paragraphs numbered 1 through 100 as if fully set forth herein.

102.    By their actions and omissions, defendants have retaliated against plaintiff

on account of opposing discrimination in the workplace with respect to compensation, benefits

and terms, conditions and privileges of employment, in violation of New York City

Administrative Code §8-107(1)(a).

103.    Defendant Chilimuri has violated New York City Administrative Law

§296(6) by aiding, abetting, inciting and coercing the unlawful retaliation outlined above.

104.    As a result of defendants' retaliation against her, plaintiff has suffered

damages, including without limitation, deprivation of income and benefits, loss of opportunity

for advancement and promotion, compensatory damages, emotional pain, suffering,

inconvenience, mental anguish, humiliation and damage to her reputation and career.

**WHEREFORE**, Plaintiff respectfully requests this Court to:

(1)    Issue a declaratory judgment that Defendants' acts, policies, practices and

procedures complained of herein violated plaintiff's rights as secured by Title VII;

(2)    Issue a permanent injunction ordering plaintiff reinstated to her prior

position as Assistant Administrative Director, Department of Medicine, with salary, benefits,

tenure, job responsibilities and other terms of employment commensurate with such position;

(3)    Order defendant to make plaintiff whole by providing: (i) backpay with

interest based on plaintiff's appropriate compensation had she not been discriminated and

retaliated against; (ii) front-pay; (iii) reimbursement for lost pension, social security, experience,

training opportunities and other benefits in an amount to be shown at trial;

(4)    Grant plaintiff compensatory damages for her emotional pain, suffering,

inconvenience, mental anguish, humiliation and loss of reputation in an amount not less than

$1,000,000;

(5)    Grant plaintiff punitive damages in an amount not less than $2,000,000;

(6)    Grant plaintiff her attorneys fees, costs and disbursements; and

(7)    Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury.

Dated:  New York, New York
        November 16, 2006

BANTLE & LEVY LLP


By:_____
     Robert L. Levy (RL-1633)

817 Broadway
New York, New York 10003
(212) 228-9666
Attorneys for Plaintiff